## O'Neill v. Reading Railway Company.

*Negligence—Railroads—Evidence—Damages—Carlisle Tables.*

1. The admission of the Carlisle Tables in a negligence case, although erroneous, is corrected where the court positively and unequivocally states in its charge the proper rule which should govern the jury in assessing the damages.

*Evidence—Impeachment of witness—Consonant prior statements.*

2. While it is proper to support a witness by proof of consonant prior statements at other times, such proof is only admissible where the testimony of such witness has been attacked and his credibility impeached.

*Negligence—Damages—Expenses—Suit by mother for death of son.*

3. In an action by a mother for the death of her son, she is entitled to recover. if she is entitled to recover at all, the necessary expenses which she had incurred as the result of the killing of her son.

*Negligence—Charge—Excerpts from charge—New trial.*

4. Excerpts from the charge will not be considered erroneous and as grounds for a new trial where the charge as a whole did not mislead the jury or prejudice the defendant's rights.

*Negligence—Railroads—Crossings—Evidence — Signals — Negative testimony—Safety-gates.*

5. In an action against a railroad company for damages for the negligent killing at a grade crossing, plaintiff's proof as to blowing the whistle is not negative in character where her witnesses were persons either approaching the crossing or who had just crossed it and who would naturally be on the lookout for a train or the signal of an approaching train.

6. Safety-gates, which should be closed in case of danger, if standing open are an invitation to the traveler to cross, and while this fact does not relieve him from the exercise of care, it is a fact for the consideration of the jury in determining whether he exercised care according to the circumstances.

*Negligence—Railroads—Crossings at grade—Death—Presumption—Evidence.*

7. Where a person is killed at a grade crossing of a railroad, the presumption is that he stopped, looked and listened. Such presumption may be rebutted, but if evidence is offered for that purpose, the case is for the jury.

Motions for new trial and for judgment *n. o. v.* C. P. Schuylkill Co., May T., 1925, No. 125.

*Henry Houck,* for plaintiff.

*John F. Whalen* and *George Ellis,* for defendant.

BECHTEL, P. J., Dec. 19, 1927.—In this case the defendant filed·a motion for judgment *n. o. v.* and a motion for a new trial. In support of the motion for a new trial, the stereotyped reasons were assigned. Later on, defendant filed additional reasons as follows:

"1. The court erred in admitting evidence of Charles Green as to the speed of train.

"2. The court erred in admitting Carlisle Tables in evidence to show expectancy of life of the plaintiff.

"3. The court erred in sustaining objection to testimony of Charles W. Fister to show that, after the accident and before the trial, Henry Dornsife, witness for defendant, made statement to the witness Fister similar to what he testified at the trial, the cross-examination of Dornsife being for the purpose of attacking his credibility.

"4. The court erred in allowing plaintiff to testify what she paid to the undertaker.

"5. The court erred in allowing evidence as to the claim for digging grave.

"6. The court erred in its charge to the jury as to what plaintiff's son contributed to her.

"7. The court erred in its charge (pages 8 and 9) in the following: 'Now, I will say to you in this connection, ladies and gentlemen, that it was the duty of the defendant's employees in charge of the train to give timely and sufficient warning of its approach to the crossing. Failing to do this, in view of the circumstances of the case, such as the guarding of the crossing, ability of travelers to see the approaching trains, its rate of speed, and things of that sort, the plaintiff, in the absence of negligence on the part of the deceased, would be entitled to recover.'

"8. The court erred in its charge, in the face of positive evidence that O'Neill did not stop to look and listen, as follows: 'Now, if you find that this young man did stop, look and listen, did he use care according to the circumstances in which he found himself? If he did not, he was guilty of negligence; and if he was guilty of negligence, the plaintiff, his mother, cannot recover. On the other hand, if he did exercise caution and was not guilty of contributory negligence, was the company guilty of negligence?'

"9. The court erred in not affirming defendant's sixth point for charge, that, under all the evidence, the verdict should be for the defendant."

The first reason in support of the motion for a new trial is not pressed upon us in the brief for the defendant. We do not feel, however, that any error was committed in admitting the evidence of Charles Green as to the speed of the train; in fact, if his testimony relative to his competency is to be believed, he was more competent than the average witness who testifies as to the speed of moving objects.

The second reason is also not pressed in the brief of counsel for the defendant. The admission of the Carlisle Tables in a case such as this is without doubt error. In this case, however, we are fully convinced that it was harmless, for the reason that the error was corrected in the charge of the court: "This woman is the mother of this young man. He was a minor; he was under the age of twenty-one. She was entitled to his earnings up until the time he should have been twenty-one."

And, again: "First of all, no one knows how long we are going to live; and while it is entirely probable that this young man would have lived to have reached the age of twenty-one, still no one can say positively that he would have done so. . . . Further than that, if you decide to allow her compensation for loss of support or earnings of this young man, you must remember that you cannot figure that he would earn or give her so much per week, and multiply it by the number of weeks from the date of his death until he would have reached the age of twenty-one, if you thought he would have lived that long; but you must figure out the present worth of it, because she is anticipating; she is getting it now for then."

In addition to this, the defendant's fifth point was as follows: "5. The plaintiff is not entitled to recover for loss of her son's earnings beyond a period of about two years and not after he became twenty-one years of age. A. We affirm that."

It will thus be seen that the jury was instructed as a matter of law, positively and unequivocally, that it could award no compensation to the plaintiff for any time after her deceased son would have been twenty-one years of age.

In the third reason it is claimed that the court erred in sustaining objection to testimony of Charles W. Fister to show that, after the accident and before the trial, Henry Dornsife, witness for defendant, made statement to

the witness Fister similar to what he testified at the trial. Mr. Fister was called during the presentation of the defendant's case sometime subsequent to Dornsife. The following question was asked: "Q. State whether or not, on the occasion of your visit to him (Dornsife) at the hospital, he made a similar statement to you? A. He did."

This was objected to; the objection was sustained, whereupon counsel for defendant made the following statement to the court: "That testimony seems to us to be quite pertinent. They have cross-examined Dornsife with the idea of attacking his veracity and credibility and recollection, and it has been decided frequently, if I recall it, that under such circumstances you can prove consonant statements made by the witness. It has been allowed in this court from the time of the Hester Case."

To this statement counsel for plaintiff replied, whereupon the court again sustained the objection, saying: "As a general rule, declarations made by witness at another time, though admissible to contradict him, are not competent to confirm or corroborate his present testimony. Such declarations are mere hearsay. . . . However, there are some recognized exceptions to this rule, and under certain circumstances prior declarations of a witness, consistent with his present testimony, are admissible in corroboration of it. While it has been said in an early case that such evidence is admissible whenever his credit is impeached by attacking his character or by proof of inconsistent declarations made by him, or whenever his testimony is contradicted by other proof, this rule has been limited by later cases, in which it is declared to be the better rule that such evidence is admissible only when it is alleged that the testimony of the witness is a recent fabrication, or he is charged with having testified from corrupt motives, or his mental capacity has been attacked. . . . But the mere fact that the conflict of evidence is such that it can be explained only on the theory that one or the other of the opposing witnesses is wilfully fabricating his testimony, is insufficient to permit one to corroborate his testimony by calling other persons to say he had told them the same thing. . . . Nor is such evidence admissible in chief, but only after evidence has been given to contradict the witness."

The rule in cases of this sort has been carefully considered and reiterated in Lyke v. The Lehigh Valley Co., 236 Pa. 38, wherein the court says: "Testimony of this character is known as evidence of a consonant statement; and this may be defined as a prior declaration of a witness whose testimony has been attacked and whose credibility stands impeached, which, considering the impeachment, the court will allow to be proved by the person to whom the declaration was made, in order to support the credibility of the witness, and which, but for the existence of such impeachment, would ordinarily be excluded as hearsay. To sustain the admission of such declarations, the impeachment must plainly appear and must go to the credibility of the witness. The law is well stated in State v. Parish, 79 N. C. 610, 614, thus: 'The rule is, that when a witness is impeached—observe, when a witness is impeached—it is competent to support the witness by proving consistent statements at other times, just as a witness is supported by proving his character, but it must not be construed as substantive evidence of the truth of the facts, any more than any other hearsay evidence. The fact that supporting a witness who testifies does indirectly support the fact to which he testifies does not alter the case. That is incidental. He is supported, not by putting a prop under him, but by removing a burden from him, if any has been put upon him. How far proving consistent statements will do that must depend upon the circumstances of the case. It may amount to much or

very little. . . . It is not usually permissible to support the credibility of a witness by evidence that he had made a former statement similar to his testimony in the case on trial, and the best considered authorities hold that evidence of this character should not be allowed except in rare instances, where the credibility of a witness is impeached in such a manner and to such an extent that the trial judge feels convinced that the witness is entitled to the support. Where this is so, and proper instructions are given to the jury concerning the real purpose and value of the testimony, no harm is likely to follow."

It will be noted that the witness Fister was called before any witnesses were offered by the plaintiff to rebut the testimony of Dornsife, in addition to which the plaintiff did not contend that Dornsife's testimony was a recent fabrication. Further than this, no formal offer of Fister's evidence was ever made to the court, and the explanation for the offering of it as given by counsel for the defendant does not, we think, bring it within the rule relative to consonant statements as herein set forth.

We do not think that the fourth and fifth reasons have any merit. The plaintiff, if she was entitled to recover, was surely entitled to recover the necessary expenses which she had incurred as the result of the killing of her minor son.

Nor do we think that the sixth reason has any merit. The plaintiff testified that her son worked as an automobile mechanic; that he gave her $20 a week, sometimes $30 and sometimes as high as $50; that when he quit at Smith's Garage, he was earning $15 a week. Surely this was evidence for the consideration of the jury to assist them in determining the earning capacity of the deceased. The specified error complained of in the court's charge relative to this item is not set forth in the reasons for a new trial, but an examination of the charge has failed to convince us that we committed any error in dealing with this subject.

The seventh reason for a new trial alleges that the court erred in its charge to the jury in using the language therein contained, and the eighth reason claims that the court erred in its charge in employing the language therein quoted. It will be noted that these are two short excerpts from the charge of the court and detached from their context. While we do not feel that the language employed was erroneous, still an examination of the charge and the context throws considerably more light on the theory on which the court submitted this case to the jury. At the very beginning of its charge on the law, the court said to the jury:

"The law presumes that this man, who is dead, did his duty; that is, it is presumed that he stopped, looked and listened. That is an imperative duty that is cast upon every citizen when he approaches a railroad crossing. There is no excuse for not complying with it, and if you find from the evidence that this young man who was killed did not stop, look and listen before he crossed this crossing, your verdict must be for the defendant in this case. Now, I have said that there is a presumption that he did that. That is based on the doctrine of the law that every man is presumed to have done what the law requires him to do. But it is only a presumption; it can be rebutted and overcome by evidence, and the first question that you will consider is whether or not that was done in this case. Now, there is only one person living, so far as we have been able to ascertain from this record, who saw this accident, and that is the crossing watchman, and he swore that this young man did not stop, look and listen as he approached the crossing.

"It is claimed that this train was operated at an excessive rate of speed as it came down to this crossing. Now it may, under certain circumstances in this case, become essential for you to know the rapidity with which the train approached the crossing, because that might assist you in determining, under all the conditions existing at the crossing, the length of time that would elapse between the giving of the signals, if you find that any were given, and the time that the train would reach the crossing; in other words, the length of time that the decedent would have had to protect or guard himself against the danger of a train crossing the road at this point.

"Now, I will say to you in this connection, ladies and gentlemen, that it was the duty of the defendant's employees in charge of the train to give timely and sufficient warning of its approach to the crossing; failing to do this, in view of the circumstances in the case, such as the guarding of the crossing, the ability of travelers to see the approaching train, its rate of speed, and things of that sort, the plaintiff, in the absence of negligence on the part of the deceased, would be entitled to recover. The law does not point out any particular mode or manner in which notice of trains approaching crossings shall be given. It does require that some suitable and adequate means adapted to the circumstances shall be adopted and applied. While companies may move their trains at such rate of speed as the character of the machinery and the roadbed may make practicable, they must not forget that increased speed of the train means increased danger to those who cross the track, and that increased care on their part to guard against accidents becomes a duty. From this, it naturally follows that the rule is that it is the duty of employees on a train approaching a crossing to give such signal as will protect the traveler if he exercises ordinary care. It is not a conclusive answer for a company to say that the bell was rung or the whistle was sounded, in replying to a charge that the train negligently approached a grade crossing, unless it appears that, under the circumstances of the case, such signal was sufficient to give timely notice to travelers who were approaching the crossing on the highway. At such crossing, the duties of the company and of the traveler are reciprocal, and each must approach the crossing with a due regard for the rights of the other; and when either fails to observe the care required, it is negligence, for which the guilty party is responsible.

"Now, it has been said that negligence is the absence of the exercise of care according to the circumstances. Every one must exercise care according to the circumstances in which he finds himself; that is, he must do what a prudent mind would do under the circumstances.

"Now, if you find that this young man did stop, look and listen, did he use care according to the circumstances in which he found himself? If he did not, he was guilty of negligence; and if he was guilty of negligence, the plaintiff, his mother, cannot recover. On the other hand, if he did exercise care and was not guilty of contributory negligence, was the company guilty of negligence? That is the next question. Unless the company was guilty of negligence you cannot find a verdict against it, even though the young man was not guilty of negligence, because to permit a person to recover from another person or from a corporation for negligence it becomes the duty of the party alleging the negligence to show to the satisfaction of the jury, by the fairly preponderating evidence in the case, that the defendant was guilty of negligence. Now, was the company guilty of negligence?"

We do not think that there was anything in this language which would tend to mislead the jury or prejudice the defendant's rights. The language was as favorable to the defendant as he had any right to expect. In addition

to this, in considering the question of the crossing gates and the claim that the gates on the Gordon side did not go down at all, the court said: "I do not know that that makes so much difference in the case. That is a question for you. As I view it, first of all, the presence of the gates would not excuse a traveler from stopping, looking and listening. He must do that whether the gates are there or not; his duty to stop, look and listen remains the same. It must be borne in mind that these gates are mechanical appliances; they are pieces of machinery; they might get out of order; they might get out of order just at the time when they want to use them; and while they are put there for an additional protection for the traveler, that does not absolve the traveler from exercising ordinary care according to the circumstances, and it would be his duty to do that. But, further than that, the thought occurs to me, while, of course, it is your privilege and your duty to pass upon this case and determine for yourself what has been proved here, even if the gates did not go down on the Gordon side of the tracks, if the gates went down on the Ashland side of the tracks and went down in time to warn anybody, any person who approached that crossing must have seen the gates down on the Ashland side and, seeing them down on the Ashland side, would naturally be put upon inquiry as to why they were down and whether or not it was safe for him to cross, even though they might not have gone down on the Gordon side."

We have now considered at length the reasons for a new trial in this case, and, for the reasons herein given, do not feel that there is any merit in any of them. There is, however, pending also a motion for judgment n. o. v. Plaintiff's minor son was killed at the grade crossing of the State highway and defendant's tracks at the lower end of the Borough of Ashland while attempting to cross the tracks in a motor-vehicle. The grade crossing is guarded by a watchman and safety-gates. It is contended that the defendant was negligent, in that it operated its train at an excessive speed, that it failed to give sufficient notice of the train's approach, and that the watchman failed to lower the safety-gates at the crossing.

As is usual in cases of this character, there is a wide divergence in the testimony relative to the speed of the train between the plaintiff's witnesses and those of the defendant. Plaintiff's witnesses fixed the speed of the train as high as between thirty-five and forty miles per hour, while defendant maintains that it was running between eighteen and twenty miles per hour. The rate of speed, of course, under these circumstances, would be a question for the jury to determine. While the plaintiff's tracks constitute its private right of way, on which it may operate its trains, still it must be borne in mind that the rights of the company and the traveler on the highway are reciprocal, and an increased rate of speed would naturally impose upon the defendant company increased care and regard for the rights of the traveling public. Under these circumstances, it seems to us material to inquire as to the warning given by defendant company of the approach of its train at this crossing.

Defendant's witnesses claim that adequate warning was given in the usual way. Plaintiff's witnesses claim that they heard no such warning. It is claimed by defendant that plaintiff's testimony is negative in its character. We do not think that that is correct, in view of the circumstances of this case. The witnesses for the plaintiff were persons either approaching the crossing or who had just crossed it, and who would naturally be on the lookout for a train or the signal of an approaching train. It seems to us, therefore, that this testimony comes rather within the rule laid down in Sharpless

v. The D., L. & W. R. R. Co., 286 Pa. 439. There it is said (page 444): "Appellant contends that adequate signals by whistle and bell were given for the crossing. There can be no question that a blast of the whistle was given when the engine was within seventy-five to one hundred feet of the crossing; substantially all the witnesses on both sides so say. It is recognized by appellant's counsel that this signal was not a sufficient warning, but they contend that, prior to it, adequate approach signals were given, and they called witnesses who so testified. Other persons speaking in appellee's behalf said that no prior danger signals were given. Appellant urges upon us that this testimony was negative under such cases as Rapp v. Central R. R. of Penna., 269 Pa. 266; Keiser v. Lehigh Valley R. R. Co., 212 Pa. 409; Craft v. Hines, Director General, 272 Pa. 499; Cubitt v. New York Central R. R. Co., 278 Pa. 366; Zotter v. Lehigh Valley R. R. Co., 280 Pa. 14, but we do not so regard it. The witnesses who declared the whistle was not blown for the crossing until the blast seventy-five or one hundred feet therefrom were not of a class who simply did not hear it, but they were in such position with reference to the railroad that they must have heard had the whistle sounded; indeed, some at least of them were expecting the train and would, therefore, have been conscious of its approach had it been heralded. Three of the witnesses were in front of a building on East Street, on which the accident occurred, a few feet only from the main track of the railroad. One of them said they were expecting the train and another that he knew the train was late. The latter said, if it had whistled, they could not have helped hearing it, and the third that he heard the toot just before it came to the crossing, and that this was the only warning given. This was not negative testimony: Simons v. Phila. & Reading Ry. Co., 254 Pa. 507; Cubitt v. New York Central R. R. Co., 278 Pa. 366."

As bearing on the length of time that a warning (if any) was given by the approaching train, it will be noted that one at least of the witnesses testified that the gates that went down were lowered while the train was on the crossing. In this connection, it is well to observe the language employed in Messinger v. The Pennsylvania R. R. Co., 215 Pa. 497, which is as follows: "Safety-gates which should be closed in case of danger, if standing open, are an invitation to the traveler on the highway to cross, and while this fact does not relieve the traveler from the duty of exercising care, it is a fact for the consideration of the jury in determining whether he exercised care according to the circumstances."

It is also claimed by defendant that plaintiff is barred from recovery by reason of the fact that the deceased was guilty of contributory negligence. The only eye-witness to the accident was the crossing watchman, who testifies positively that the deceased approached the crossing at a rate of speed which he estimates at between thirty-five and forty miles per hour, and, despite his (the watchman's) efforts to stop him, drove on to the crossing without slackening his speed or making any attempt to stop, look and listen. As we have already said, since O'Neill was killed, he is presumed to have stopped, looked and listened. It is claimed, however, that the court should have ruled as a matter of law that the testimony of Dornsife, the watchman, overcame this presumption and convicted O'Neill of contributory negligence. The rule applicable to cases of this character is laid down in Patterson v. The Railway Co., 210 Pa. 47, as follows: "The plaintiff was entitled to go to the jury on the presumption that the deceased did his duty to stop, look and listen before driving on the tracks. Whether that presumption was rebutted was for the jury, unless the evidence to the contrary was clear,

positive, credible and either uncontradicted or was so indisputable in weight and amount as to justify the court in holding that a verdict against it must be set aside as a matter of law."

The law relative to this subject was considered at length and laid down in the following language by the Supreme Court in Kelly v. The Director General of Railroads, 274 Pa. 470: "Presumptions are only intended to take the place of facts and cannot be relied upon where the facts are shown: Chalfant v. Edwards, 173 Pa. 246, 252; Cohen v. Phila. R. T. Co., 228 Pa. 243, 247; Williams v. Metropolitan Edison Co., 267 Pa. 158, 161. But where a presumption in favor of a party entitles him to have his case submitted to the jury, it cannot be withdrawn from them merely because the other gives evidence tending to rebut that presumption: Spear v. The P. W. & B. R. Co., 119 Pa. 61, 69; Doud v. Hines, 269 Pa. 182, 185. 'The presumption of a fact in law, which carries a case to a jury, necessarily leaves them in possession of the case. True, the evidence to rebut the presumption may be very strong, yet it is a matter for the jury and not for the court. The force of the evidence may or may not be sufficient to convince them that the natural presumption arising from human instinct is repelled. But, before they can come to this conclusion, they must consider the circumstances under which the repelling witnesses testify. They may be such as not to convince a rational mind that the deceased heedlessly rushed into danger, or the character of the witnesses and their appearance before the jury may render them unworthy of belief; consequently, the jury only can determine the fact put in issue by the presumption of law:' Pennsylvania R. R. Co. v. Weiss, supra, page 449. In determining whether the facts are so clearly established that a court can say as matter of law that the presumption is rebutted, the proper criterion is whether a verdict in favor of the party relying upon the presumption would be permitted to stand, or whether the court would be bound to set it aside as against the evidence in the case."

We feel that this case comes within the language herein quoted, and that we cannot, therefore, sustain the motion for judgment n. o. v.

The motion for a new trial is herewith overruled and the motion for judgment n. o. v. is herewith denied.          From M. M. Burke, Shenandoah, Pa.